## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **HITS BEFORE FAME, LLC,** *et al.*, | |
| *Plaintiffs*, | |
| **v.** | **Case No. 1:20-cv-01845-RCL** |
| **DANIEL HERNANDEZ,** *et al.*, | |
| *Defendants*. | |

## MEMORANDUM OPINION

Plaintiffs Hits Before Fame, LLC and After Hours, LLC are promotional companies engaged in the business of staging live musical performances. The companies contracted with Daniel Hernandez, a rapper professionally known as Teka$hi 6ix9ine, to perform a live concert at Echostage D.C. on October 28, 2018. Mr. Hernandez did not show up for the concert, causing Plaintiffs significant financial and reputational harm. In July 2020, Plaintiffs filed this lawsuit against Mr. Hernandez and members of his management team (collectively, Defendants). The Clerk has entered default against all Defendants for failing to appear in or otherwise defend this action.

Before the Court are two motions: Plaintiffs' Motion [63] for Default Judgment as to Defendant Daniel Hernandez, and Plaintiffs' Motion [73] for Default Judgment as to Defendant Kifano Jordan, Mr. Hernandez's former manager, professionally known as Shotti.[1] For the reasons contained herein, the Court will **GRANT IN PART** and **DENY IN PART**, with prejudice, the Motion for Default Judgment against Mr. Hernandez. The Court will **DENY**, with prejudice, the

---

[1] The Court already granted Plaintiffs' motion default judgment against the remaining defendants on September 29, 2021. Order, ECF No. 30.

Motion for Default Judgment against Mr. Jordan.  The Court will award Plaintiffs $250,000 in compensatory damages for Mr. Hernandez's breach of contract.

## I.    BACKGROUND

### A.  Factual History

The facts of this case are drawn solely from the Complaint and are taken as true, as Defendants have not offered their own account.  *See Thomson v. Wooster*, 114 U.S. 104, 111 (1885) (plaintiff's claims taken as true after entry of default).  On October 25, 2017, Plaintiff Hits Before Fame contacted Defendant Christian Ehigiator, an agent of Mr. Hernandez, to engage Mr. Hernandez for a live performance on December 8, 2017 in Washington, D.C. at Bliss Nightclub. Compl. ¶ 16.  On October 28, 2017, Hits Before Fame deposited by wire transfer $3,500—a fifty-percent deposit, per standard industry practice—into the account of Defendant Supers Wherehouse, a corporation receiving funds for Mr. Hernandez, to secure the performance date.  *Id.* ¶ 17.

Sometime thereafter, "due to rescheduling on the part of Bliss Nightclub and other factors which both parties mutually understood," Hits Before Fame agreed with Mr. Ehigiator to reschedule the performance.  *Id.* ¶ 18.  Mr. Ehigiator then directed Hits Before Fame to Defendant William Cornish, another agent of Mr. Hernandez and principal of Defendant company 1st Call Entertainment, for further negotiations.  *Id.* ¶¶ 10, 20.  Mr. Cornish prepared an agreement setting Mr. Hernandez's new performance date for March 23, 2018 at a then-to-be-determined location, and obligating Plaintiffs to pay Mr. Hernandez $20,000 as the performance fee.  *Id.* ¶ 21.  On February 12, 2018, in partial payment of this fee, Hits Before Fame wired $10,000 to Supers Wherehouse.  *Id.* ¶ 24; Receipt, ECF No. 1, Ex. C.  On February 13, 2018, Hits Before Fame engaged After Hours, the other Plaintiff in this action, to assist with planning and coordinating the

performance.  Compl. ¶ 25.  The Agreement was fully executed on February 14, 2018.  *Id.* ¶ 22; ECF No. 1, Ex. A ("the Agreement").

Plaintiffs secured a D.C. concert hall, Echostage, for the performance, but "[d]ue to lack of promotion by Defendant Hernandez, as well as fear for his safety and that of the attendees due to numerous highly publicized street beefs leading up to the Event," Echostage placed Mr. Hernandez's performance on hold.  Compl. ¶¶ 26, 28.[2]  Then, "[a]fter several months and extensive attempts to coordinate another date" with Mr. Hernandez, Mr. Ehigiator, and Mr. Cornish, Plaintiffs "w[ere] able to secure the reschedule date of October 28, 2018."[3]  *Id.* ¶ 29.  The new date of October 28, 2018, was selected in part to coincide with Howard University's homecoming, "which could reasonably be expected to bring an influx of potential concertgoers to the District of Columbia and would give the time and the opportunity to generate greater ticket sales than any other time of year."  *Id.* ¶ 30.

"As a condition precedent to final confirmation of the new date" for the performance, Mr. Hernandez, "by and through his agents," demanded that Plaintiffs pay Mr. Hernandez an increased fee of $60,000, to which Plaintiffs consented.  *Id.* ¶ 31.  So, on September 2, 2018, Plaintiffs delivered an additional $44,970 in cash to Mr. Kifano Jordan—a member of Mr. Hernandez's management team, and the other defendant against whom Plaintiffs have moved for default judgment—with Plaintiffs confirming over text "that all but $1,530 of [Mr. Hernandez's] performance fee had been paid in full."  *Id.* ¶ 32; Ex. D, Text Message Confirmation, ECF No. 1-

---

[2] The Complaint does not indicate when Echostage was initially secured for the March performance date, or when Echostage made this postponement decision, though the Court infers that it must have been sometime between the signing of the Agreement in February and the scheduled performance in March.

[3] It is also not clear, based on the Complaint, when the rescheduling decision to October 28, 2018 was made.  As noted *infra*, it appears that Hits Before Fame reserved Echostage as the venue for the rescheduled performance on September 14, 2018.  Compl. ¶ 33.  Presumably, the decision among all parties to pick the October 28 performance date was made sometime in September.  The written Agreement does not reflect the rescheduled date of October 28, 2018.

5. On September 14, 2018, Plaintiffs contracted again with Echostage to reserve the venue for October 28, 2018, for a sum of $25,000. Compl. ¶ 33. Plaintiffs expended $11,497 on online promotion of the performance. *Id. ¶* 34; Ex. E, Social Media Receipts, ECF No, 1-5. Plaintiffs also engaged several other artists as opening acts for $19,500, contributing to their expense in putting on this event. *Id.* ¶¶ 42–43.

On October 11, 2018, Mr. Hernandez's agent MTA,[4] "without cause, right or justification, threatened to cancel the Event." Compl. ¶ 36. Plaintiffs responded via email, assuring that Mr. Hernandez had been paid and that Plaintiffs had been in contact with Defendant Jordan regarding the event. Ex. F, Email, ECF No. 1-5 ("We have been in communication with [Mr. Jordan] for months . . . and the date is paid in full. We will call [Mr. Jordan] today."). Two days later, on October 13, 2018—roughly two weeks before the concert was to take place—Mr. Hernandez recorded a promotional video in which he acknowledged the rescheduled concert as a "make-up date for the Howard homecoming." Compl. ¶ 37. However, that promotional video was never posted publicly by Mr. Hernandez. *Id.* ¶ 45.

On the day of the concert, October 28, 2018, Plaintiffs represent that 3,108 tickets, representing 69% of the venue's capacity, had been pre-sold for a total of $165,336. Compl. ¶ 40; Ex. I, ECF 1-6. Additionally, $30,300 was generated in presold VIP tables. *Id.* ¶ 41. Concertgoers arrived at Echostage as early as noon, and the line grew to nearly one thousand people "willing to withstand the intermittent rain and cold temperatures of that day." Compl. ¶ 53. Mr. Hernandez's appearance was highly anticipated and "set the stage for what was due to be one of the most lucrative events to date for the Plaintiffs." *Id.* ¶ 55.

---

[4] Plaintiffs allege that "sometime after the execution of the Agreement," Mr. Cornish and Mr. Ehigiator were both fired by Mr. Hernandez, and Mr. Hernandez then hired Defendant MTA as his new agent and/or manager. Compl. ¶ 35.

However, communication between the parties broke down.  Plaintiffs repeatedly attempted to contact MTA and Mr. Jordan regarding Mr. Hernandez's arrival and performance time.  *Id.* ¶¶ 49, 56.  But MTA, only selectively answering Plaintiffs' calls and texts, claimed that neither they nor Mr. Jordan were able to contact Mr. Hernandez, and Mr. Jordan "abruptly stopped taking phone calls from the Plaintiffs." *Id.* ¶¶ 49–51, 56–59.  After a series of failed attempts at contacting Mr. Hernandez, at 7:30 p.m., "fearing that the crowd outside Echostage, which was chanting for [Mr. Hernandez] to appear, was about to riot," Echostage was forced to cancel the concert a half hour before the doors were scheduled to open at 8:00 p.m. *Id.* ¶¶ 61–63.  Much to Plaintiffs' surprise, on that same night shortly after the cancellation, Mr. Hernandez performed at Powerhouse NJ, a radio event held at the Prudential Center in Newark, New Jersey. *Id.* ¶ 68.

Plaintiffs were forced to turn away all customers, including nearly one thousand who were already standing in line to purchase tickets, and refunded $165,336 in pre-sold ticket proceeds and $30,300 in VIP table proceeds. *Id.* ¶¶ 64–65.  The abrupt cancellation "led to a litany of negative comments and threats via social media and text messages aimed at the Plaintiffs," and Mr. Hernandez's appearance at Powerhouse NJ that same night led to "increased negative social media commentary, additional threats, and trolling." *Id.* ¶¶ 66, 70.  Mr. Hernandez also posted an Instagram livestream in which he attacked Plaintiffs, falsely stating that Plaintiffs did not pay him, and "denigrating their business acumen, their common-sense, and their trustworthiness as promoters." *Id.* ¶¶ 72–73.  Plaintiffs allege that they have "suffer[ed] increasingly diminishing rates of ticket sales and of presales of VIP tables for other events," damaging their financial outcomes and promotional business success. *Id.* ¶¶ 75–76.

### B.  Procedural History

Plaintiffs filed this action on July 8, 2020 alleging six counts:

Count 1: Breach of Contract (against Mr. Hernandez);
Count 2: Conversion (against Mr. Jordan, Mr. Ehigiator, and Supers Wherehouse);
Count 3: Unjust Enrichment (against all defendants);
Count 4: Fraud in the First Degree (against all defendants);
Count 5: Defamation (against Mr. Hernandez);
Count 6: Promissory Estoppel (against all defendants).

Compl. ¶¶ 78–109. Defendants were served thereafter. By December 8, 2020, Defendants MTA, Supers Wherehouse, Mr. Cornish, Mr. Ehigiator, and 1st Call Entertainment—i.e., all defendants other than Mr. Hernandez and Mr. Jordan—were in default for failure to timely respond. Clerk's Entry of Default, ECF Nos. 19–25. The Court granted Plaintiffs' motion for default judgment against these defendants on September 29, 2021. Order, ECF No. 30.

The saga leading up to the default of Mr. Jordan and Mr. Hernandez is more complicated. In December 2020, Plaintiffs moved to serve Mr. Hernandez by publication but the Court denied the motion because, as Plaintiffs themselves noted, Mr. Hernandez was in the Witness Protection Program and should therefore have a designated agent for service. Mot. for Service by Publication, ECF No. 27; Order, ECF No. 31. Mr. Hernandez was then served on January 14, 2022. Return of Service, ECF No. 33. But Mr. Hernandez failed to file an answer, and the Clerk entered his default on June 29, 2022. ECF No. 36. Plaintiffs moved for default judgment on June 30, 2022. Hernandez Mot. for Default J. at 2, ECF No. 37. The Court denied Plaintiffs' motion for failure to offer proof of damages and because not all defendants had defaulted.[5] Order, ECF No. 45. However, in January 2024, upon further review of the Return of Service Affidavit [ECF No. 33], the Court determined that Plaintiffs "had not adequately established Mr. Hernandez's residence at the address where service occurred" and ordered Plaintiffs to provide proof of proper service on Mr. Hernandez. Order of Jan. 29, 2024, ECF No. 49.

---

[5] "As a general rule [], when one of several defendants who is alleged to be jointly liable defaults, judgment should not be entered against that defendant until the matter has been adjudicated with regard to all defendants, or all defendants have defaulted." 10A Wright & Miller, Fed. Prac. & Proc. Civ. § 2690 (4th ed., June 2024 update).

After reviewing Plaintiffs' subsequent filings, the Court was satisfied that proper service was effected on Mr. Hernandez at his Dominican Republic address, and the Court directed Plaintiffs to seek default and move for default judgment against Mr. Hernandez. Order of Aug. 5, 2024, ECF No. 58. The Clerk entered default as to Mr. Hernandez on August 15, 2024, and Plaintiffs moved for default judgment that same day. Clerk's Entry of Default, ECF No. 62; Hernandez Mot. for Default J., ECF No. 63. That Motion is currently before the Court.

As for Mr. Jordan, Plaintiffs served him on October 21, 2020. Return of Service, ECF No. 11. Mr. Jordan initially responded asking to proceed pro se and for an extension of time, but due to clerical errors, the Court's order granting his motion was never mailed to the detention facility where he was incarcerated.[6] When this issue was discovered almost two years later, the Court reopened Mr. Jordan's window of time to file an answer. Order of July 6, 2022, ECF No. 38. Mr. Jordan then filed his Answer, so the Court denied Plaintiffs' then-pending motion for default judgment against Mr. Jordan. Answer, ECF No. 44; Order of September 9, 2022, ECF No. 41. But in late 2022 and early 2023, for reasons still unknown to the Court, mailings to Mr. Jordan were being returned as undeliverable. ECF Nos. 42, 47, 48. In January 2024, the Court ordered Mr. Jordan to provide his current address to the Court, and in February 2024, Mr. Jordan filed a Motion for Summary Judgment, curiously from the same detention facility as when the lawsuit began—indicating he had never moved. Order, ECF No. 49; Mot. for Summ. J., ECF No. 50. The Court denied this motion, *see* ECF No. 54, and, in August 2024, Court ordered the Plaintiffs and Mr. Jordan to each file a written report proposing a scheduling order for proceedings within

---

[6] In September 2019, almost a year after the incident at issue in the instant lawsuit, Mr. Jordan was sentenced to 15 years in prison in connection with a robbery and a non-fatal shooting carried out as part of his participation in the Nine Trey Gangsta Bloods. *See* Press Release, U.S. DEP'T OF JUSTICE (Sept. 6, 2019), https://www.justice.gov/usao-sdny/pr/high-ranking-member-nine-trey-gangsta-bloods-sentenced-15-years-prison-connection [https://perma.cc/6C4L-G2NU].

fourteen days.  Order, ECF No. 58.  Mr. Jordan did not comply, so the Court ordered Mr. Jordan to show cause as to why he should not be defaulted in this action.  Show Cause Order, ECF No. 67.  Once again, Mr. Jordan failed to respond in any fashion, and this Court ordered that Mr. Jordan was in default as of October 4, 2024.[7]  On October 18, 2024, Plaintiffs moved for default judgment.  Jordan Mot. for Default J., ECF No. 73.  That motion, like the motion for default judgment against Mr. Hernandez, is now before the Court as well.

On September 16, 2024, the Court held a hearing pursuant to Federal Rule of Civil Procedure 55(b)(2)(B) to "determine the amount of damages."  Unsurprisingly, none of the defendants made an appearance.  After the damages hearing, Plaintiffs filed a "Memorandum in Support of Ex-Parte Proof Against All Defendants," ECF No. 70, summarizing the evidence from the damages hearing.

The Motions for Default Judgment against Mr. Hernandez, Hernandez Mot. for Default J., ECF No. 63, and against Mr. Jordan, Jordan Mot. for Default J., ECF No. 73, with no oppositions filed thereto, are now ripe for this Court's review.

## II.    LEGAL STANDARDS

### A.  Default Judgment

Rule 55 of the Federal Rules of Civil Procedure establishes the two-step process for plaintiffs to obtain a default judgment.  The Clerk of Court must first enter a default "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise."  Fed. R. Civ. P. 55(a).  Upon entry of default by the Clerk of the Court, the "defaulting defendant is deemed to admit every well-pleaded

---

[7] Due to an administrative error, the Clerk's Entry of Default was not placed on the docket until March 13, 2025, ECF No. 74.  However, the Entry of Default indicates that Mr. Jordan was indeed in default as of October 2024.

allegation in the complaint." *United States v. Bentley,* 756 F. Supp. 2d 1, 3 (D.D.C. 2010).  A court may then enter a default judgment pursuant to Rule 55(b).

"Default judgment is appropriate when the defendant is an 'essentially unresponsive party' whose default is 'plainly willful, reflected by its failure to respond to the summons or complaint, the entry of default, or the motion for default judgment.'" *Reyes v. Kimuell*, 270 F. Supp. 3d 30, 33 (D.D.C. 2017) (quoting *Carazani v. Zegarra*, 972 F. Supp. 2d 1, 12 (D.D.C. 2013)).  "However, "a district court may still deny an application for default judgment where the allegations of the complaint, even if true, are legally insufficient to make out a claim." *Gutierrez v. Berg Contracting Inc.*, No. 99-3044-TAF, 2000 WL 331721, at *2 (D.D.C. Mar. 20, 2000); *see also United States v. $1,0171,251.44 of Funds Associated with Mingzheng Int'l Trading Ltd.*, 324 F. Supp. 3d 38, 45 (D.D.C. 2018) ("[T]he defendant['s] default notwithstanding, the plaintiff is entitled to a default judgement only if the complaint states a claim for relief.") (second alteration in original) (quoting *Jackson v. Corr. Corp. of Am.*, 564 F. Supp. 2d 22, 26–27 (D.D.C. 2008)).

In granting default judgment, the court must determine the sum to be awarded.  *Bentley,* 756 F. Supp. 2d at 3*;* Fed. R. Civ. P. 55(b). "The court may rely on detailed affidavits or documentary evidence to determine the appropriate sum for the default judgment." *Id.*  Of course, "[w]ithout defendants' participation in the case . . . the factual record is one-sided and incomplete," but "defendants cannot escape liability merely by refusing to participate." *Pleitez v. Carney*, 594 F. Supp. 2d 47, 48–49 (D.D.C. 2009).  So, "[w]hen a full documentary record is unavailable, a court may draw reasonable inferences from plaintiffs' recollections and whatever documentation has been presented" to determine damages.  *Id.* at 49.

## III.    DISCUSSION

### A.  Forum Selection and Choice of Law Clause

The contract that forms the basis of this lawsuit contains a clause specifying that disputes arising under the contract are to be litigated under Pennsylvania law in Philadelphia County, Pennsylvania.  *See* Ex. A, Agreement, ECF No. 1-5.  Plaintiffs do not address this clause in their Complaint or in their briefing.

The D.C. Circuit has explained that "[t]here is a 'substantial presumption' in favor of a plaintiff's chosen forum."  *MBI Group, Inc. v. Crédit Foncier du Cameroun*, 616 F.3d 568, 571 (D.C. Cir. 2010) (quoting *Agudas Chasidei Chabad of United States v. Russian Fed'n*, 528 F.3d 934, 950 (D.C. Cir. 2008)).  Notwithstanding this presumption, if the parties have agreed to a forum selection clause, the defendant "may enforce that agreement by moving to dismiss for *forum non conveniens*." *Azima v. RAK Inv. Auth.*, 926 F.3d 870, 874 (D.C. Cir. 2019).

The Court is perplexed by the Pennsylvania forum selection clause because no party has any apparent connection to Pennsylvania.[8]   The Complaint states that at the time of filing, Plaintiffs were both domiciled in the District of Columbia and Defendants were domiciled in New York, New Jersey, Florida, and Connecticut.  Compl. ¶ 1.[9]  Mr. Hernandez was listed with a New York address on the Complaint, and subsequent documents filed by the Plaintiffs indicate they attempted to serve him in New York, Florida, and the Dominican Republic.  *See* Mot. for Extension of Time, ECF No. 52.  And of course, the events underlying this case pertain to a

---

[8] Mr. Jordan was incarcerated at Allenwood FCI in Pennsylvania as of February 2020, when he filed his first motion with the Court, and as recently as February 2024, when he filed his motion for summary judgment.  *See* Answer, ECF No. 44; Mot. Summ. J., ECF No. 50.  But Mr. Jordan was not incarcerated in Pennsylvania at the time of contracting, so his eventual placement there would not explain the connection to Pennsylvania in the contract.  And Mr. Jordan did not mention the choice of law clause in any of his filings nor attempt to enforce it.

[9] Although the Complaint states that "Plaintiffs are both domiciled in the District of Columbia[,]" the address listed for Plaintiff After Hours, LLC is an address in Ellicott City, Maryland.  *See* ECF No. 1.  However, even if Maryland is the correct domicile for After Hours LLC, there would still be complete diversity among the parties.

scheduled performance in the District of Columbia.  Defendants have not made an appearance

(save for Mr. Jordan who has now defaulted), let alone moved to dismiss for *forum non*

*conveniens*.  Therefore, the Court will not enforce the forum selection clause *sua sponte*.

      The contract also provides that disputes "shall be resolved . . . in accordance with

Pennsylvania law."  ECF No. 1 at A-4.  Once again, neither the Complaint nor Plaintiffs'

motions for default judgment account for this choice-of-law provision or even address what law

applies to Plaintiffs' claims.  So, the Court has conducted its own choice-of-law analysis.  *See*

*Cont'l Cas. Co. v. Contest Promotions NY, LLC*, No. 15-cv-501 (MKB), 2016 WL 1255726, at

*2 (E.D.N.Y. Mar. 28, 2016) (conducting choice-of-law analysis *sua sponte* when the plaintiff

failed to do so in order to resolve the pending default judgment motion); *Hartford Cas. Ins. Co.*

*v. MRH Contractor, Inc.*, No. 23-cv-1567, 2024 WL 3904049, at *2 n.2 (E.D. Pa. Aug. 22, 2024)

(same).  The analysis here is straightforward: when jurisdiction is based on diversity, the Court

applies the substantive law of the forum in which it sits.  *Peck v. SELEX Sys. Integration, Inc.*,

270 F. Supp. 3d 107, 113 (D.D.C 2017).  And when there is a choice-of-law provision in a

contract, District of Columbia courts will give effect to it "as long as there is some reasonable

relationship with the state specified."  *Africare, Inc. v. Xerox Complete Document Sol's*

*Maryland, LLC*, 436 F. Supp. 3d 17, 31 (D.D.C. 2020) (citing *PCH Mut. Ins. Co., Inc. v. Cas. &*

*Sur., Inc.*, 569 F. Supp. 2d 67, 72 (D.D.C. 2008)) (internal quotation marks and citations

omitted).  But here, as explained *supra*, there does not appear to be any relationship with

Pennsylvania whatsoever.

      Applying the choice of law principles of the forum in which this Court sits, D.C. employs

a "governmental interests" analysis to determine the appropriate law to apply and considers a)

the place where the injury occurred; b) the place where the conduct causing the injury occurred;

c) the domicile, residence nationality, place of incorporation and place of business of the parties; and d) the place where the relationship is centered. *District of Columbia v. Coleman*, 667 A.2d 811, 816 (D.C. 1995) (citing *Hercules & Co. v. Shama Restaurant*, 566 A.2d 31, 40–41 (D.C. 1989)). In this case, the alleged injury occurred in D.C., as did the alleged contractual breach. Thus, the Court will proceed with applying District of Columbia law to the Plaintiffs' substantive claims. See *Hawkins v. Washington Metro. Area Transit Auth.*, 311 F. Supp. 3d 94, 104 (D.D.C. 2018) (concluding under D.C. choice of law principles that D.C. law applies, observing that "the parties' only relationship and interaction existed in D.C.").

### B. Counts Against Mr. Hernandez

The Complaint lists six counts in total, two of which are against Mr. Hernandez only: Count I (breach of contract) and Count V (defamation). *See* Compl. ¶¶ 78–82, 100–02. The Court will proceed through each of these counts to determine whether Plaintiffs have stated a claim for relief and ascertaining the amount of damages. The Court emphasizes that judgment by default is limited to the relief demanded in the Complaint. Fed. R. Civ. P. 54(c). "The theory [of Rule 54(c)] is that the defending party should be able to decide on the basis of the relief requested in the original pleading whether to expend the time, effort, and money necessary to defend the action." *Judgments in Default Cases*, 10A Wright & Miller, Fed. Prac. & Proc. Civ. § 2663 (4th ed., June 2024 update).

#### 1. Count I: Breach of Contract

Plaintiffs allege that they fully performed their end of the Agreement, including payment of $58,470 "which far exceeded the $30,000 advance payment required," and that Mr. Hernandez's last-minute no-show constitutes material breach of the contract. Compl. ¶¶ 80–81. To state a claim for breach of contract under D.C. law, a party must establish: "(1) a valid

contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of

that duty; and (4) damages caused by [the] breach." *Logan v. LaSalle Bank Nat'l Ass'n*, 80 A.3d

1014, 1023 (D.C. 2013) (quoting *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C.

2009)).  The Court finds that Plaintiffs' Complaint sufficiently alleges facts to support its claim

for breach of contract—the Plaintiffs have submitted a signed performance agreement, *see* Ex. A,

ECF No. 1-5, alleged a mutual agreement to postpone the date, provided exhibits to that effect

(including Mr. Hernandez confirming the postponement, *see* Ex. G., ECF No. 1-5), and proved

that Mr. Hernandez never showed up, forcing Plaintiffs to refund thousands of dollars in ticket

sales and lose out on significant profits.  Therefore, Plaintiffs are entitled to default judgment on

the question of Mr. Hernandez's liability under the contract.

   Plaintiffs allege that because of Mr. Hernandez's breach, they are entitled to at least

$300,000 in compensatory damages.  Compl. ¶ 82.  Under D.C. Law, compensatory damages are

available for breach of contract actions, and are intended to restore the plaintiff to the same

position they would have been in had the defendant not breached.  *Hildreth Consulting Eng'rs,

P.C.*, 801 A.2d 967, 972 (D.C. 2002).  At the damages hearing, Plaintiffs provided testimony

regarding their expected earnings had Mr. Hernandez performed as agreed, and Plaintiffs also

cited exhibits from the Complaint confirming ticket sales.  Tr. of Sept. 24, 2024 (hereinafter

"Tr."),[10] 29:3–33:9 (testimony regarding expectation damages); Tr. 19:8–20:5 (introducing

exhibits from the Complaint regarding ticket sales); *see* Ex. I, ECF No. 1-6 (confirmed ticket

sales); Ex. J, ECF No. 1-6 (confirmed table sales).  Some other earnings estimates are included

below:

- The average ticket price was roughly $80 to $100.  Tr. 26:15–18.

---

[10] The transcript of the damages hearing is not yet available on the public ECF docket.

- Of all concertgoers, usually 500 to 1,000 people pay "skips," i.e. an additional fee to not wait in line, for $100 per person.  Tr. 29:21–22.

- There would have been roughly 40 tables sold for about $1,500 average per table.  Tr. 29:24–30:1.

- Plaintiffs had also secured $29,000 from up-and-coming artists who paid Plaintiffs for an opening slot to portray their talent in front of this large crowd.  Tr. 24:10–21.[11]  Upon cancelation, this revenue was refunded to those artists.  Tr. 30:23–31:1.

- Plaintiffs would have received 20 percent commission of the total net bar sales, which they projected at $80,000 (so, $16,000 in commission).  And, because their deal with Echostage provides that the venue fee is waived when the bar nets over $40,000, Plaintiffs testified that Echostage would have waived the venue fee of $30,000.  Tr. 30:6–19.

However, the Plaintiffs offer conflicting evidence as to the total amount of projected profit—either $250,000 or $300,000.  Tr. 27:21, 33:9.  Moreover, the Court notices a discrepancy in Plaintiffs' representation of confirmed ticket sales.  The Complaint alleges that on the day of the event, 3,108 tickets had been pre-sold on the ticket website Eventbrite, representing 69% of ticket capacity.  Compl. ¶ 40; *see* Ex. I, ECF No. 1-6 (showing that 3,108 tickets, out of 4,513 available, had been sold).  But at the damages hearing, Plaintiffs represented

---

[11] In the Complaint, Plaintiffs also state that they expended $19,500 in funds to hire well-known opening acts. Compl. ¶¶ 42–43.  The Court construes this as a separate expense, not reflected in the opening act revenue from up-and-coming artists, who paid Plaintiffs.  However, the Court cannot definitively discern from the filings whether Plaintiffs were able to recoup the $19,500 paid to the well-known openers.  But the Court concludes that this amount is immaterial to the ultimate damages award, given that the Court is taking a conservative approach as explained *infra*.

that Echostage "is capped at 3,000 people."[12]  Tr. 29:14–15.   The Court cannot reconcile the difference between Plaintiffs' representation of total ticket sales and the venue capacity of 3,000. Perhaps it is customary to sell tickets beyond capacity with the expectation that a certain percentage of ticket holders will not show up, or perhaps the cap of 3,000 is not strictly enforced. Unfortunately, Plaintiffs offer no explanation for this discrepancy.

The Court is therefore inclined to take a more conservative estimate regarding compensatory damages.  Given the figures and receipts Plaintiffs have produced, the Court believes it is reasonable to conclude that Plaintiffs would have profited $250,000 had Mr. Hernandez performed his contractual obligations—3,000 concertgoers averaging $80 a ticket, with $50,000 in "skips," 20% bar commission, $30,000 in opening act revenue, less Plaintiffs' costs for promotion and securing Mr. Hernandez's performance.  Therefore, Plaintiffs are entitled to default judgment against Mr. Hernandez for breach of contract and the Court will award compensatory damages in the amount of $250,000.

## 2.  Count V: Defamation

Plaintiffs allege that Mr. Hernandez defamed them in an Instagram livestream video.  The posts "included statements to the effect that the Plaintiffs did not pay [Mr. Hernandez] the contracted for deposit and that the individuals who acted as his agents in his dealings with the Plaintiffs did not, in fact, work with [Mr. Hernandez]."  Compl. ¶¶ 73, 100–102; *see* Ex. N, Transcript of Post, ECF 1-6.[13]

---

[12] The Agreement also lists the venue capacity as 3,000.  Ex. A, ECF No. 1-5

[13] As a threshold matter, it appears that the limitation period for Plaintiffs' defamation claim has expired. The statute of limitations period for defamation under D.C. law is one year.  D.C. Code § 12-301(a)(4).  Plaintiffs filed suit on July 8, 2020, and the Court is under the impression that the allegedly defamatory statements were made by Mr. Hernandez shortly after his no-show on October 28, 2018.  *See* Compl. at ¶¶ 72-77;.  That said, Defendants failed to raise the relevant statute of limitations, and "[r]eliance on a statute of limitations is an affirmative defense and is waived if a party does not raise it in a timely fashion."  *Banks v. Chesapeake and Potomac Tel. Co.*, 802 F.2d 1416, 1427 (D.C. Cir. 1986).

A defamation claim under D.C. law requires "that the defendant made a false and defamatory statement concerning the plaintiff." *Florio v. Gallaudet Univ.*, 2024 WL 4394917, at *3 (Oct. 4, 2024) (quoting *Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1240 (D.C. 2016)). But the Court notices a tension in Plaintiffs' Complaint that puts it at odds with Count II, Conversion. In alleging Conversion against Defendants Mr. Ehigiator, Supers Wherehouse, and Mr. Jordan, discussed *infra*, Plaintiffs reference Mr. Hernandez's allegedly defamatory statements: "[i]n the aftermath of [Mr. Hernandez's] refusal to perform . . . he stated . . . that he never received any payment due to him under the Agreement and that Defendants Ehigiator, Supers and Jordan were not his agents." Compl. ¶ 87. But ironically, the very next paragraph of the Complaint defeats Plaintiffs' own defamation claim: "[I]f [Mr. Hernandez's] statements . . . are *true* . . . [then] Defendants Ehigiator, Supers and Jordon [sic] converted the Plaintiffs' property, i.e., the sum of $58,470.00, to their own personal use." *Id.* ¶ 88 (emphasis added).

If Mr. Hernandez was telling the truth when he said he had not been paid and that the other defendants were not his actual agents, then Plaintiffs' defamation claim fails—but the conversion claim could conceivably have a basis, based on the agents' unlawful withholding of the payment. If Mr. Hernandez was lying, and he indeed *was* paid, then Mr. Hernandez's statements could potentially be defamatory. The Court suspects that this is partially an error of imprecise language—that what Plaintiffs *meant* was, Mr. Hernandez's statement that Plaintiffs did not pay was false because Plaintiffs *did* pay Mr. Hernandez's management team. But as Plaintiffs acknowledge, it may be true that Mr. Hernandez never saw that money because the management team illegally kept it. The language in the Complaint is critical—in default judgment actions, the "defending party should be able to decide on the basis of the relief requested in the original pleading whether to expend the time, effort, and money necessary to

16

defend the action." *Judgments in Default Cases*, 10A Wright & Miller, Fed. Prac. & Proc. Civ. § 2663 (4th ed.). And a self-defeating defamation claim may have not been worth Mr. Hernandez's time, effort, and money to defend.

But regardless of the tension outlined above, in analyzing the transcript of the allegedly defamatory statements, it is not clear to the Court that Mr. Hernandez is even talking about Plaintiffs, let alone saying that Plaintiffs never paid him. Mr. Hernandez said: "the people did not pay me," "they was working with some corrupt, scamming [] – whoever saying they was in charge of me wasn't in charge," and "they paid some people that, the money never came to me." Ex. N, Transcript of Post, ECF No. 1-6. To the Court, these statements seem to be directed at Mr. Hernandez's management team and their failure to pay him, not Plaintiffs.

In any event, Plaintiffs fail to provide any proof of damages with regard to defamation. *C.f. Combs v. Coal & Mineral Mgmt. Servs., Inc.,* 105 F.R.D. 472, 474 (D.D.C. 1984) (awarding monetary damages because the plaintiff's affidavit set forth a calculation of the requested damages that the court was able to ascertain as accurate). In neither their motion for default judgment, nor in the materials from the damages hearing, do Plaintiffs offer a calculation of the requested damages for defamation.[14] The Court therefore has no "reasonable certainty" for any award of damages, as required under Federal Rule of Civil Procedure 55(b)(2). For all of these reasons, the Court therefore denies Plaintiffs' Motion for Default Judgment against Mr. Hernandez as to the defamation claim.

---

[14] At the damages hearing during discussion of the defamation count, Plaintiffs' counsel indicated an intent to elicit testimony regarding "an estimate of how much money [Plaintiffs] lost in the first year," but the Court concluded the hearing because of a scheduling conflict. Tr. 77:13–14. The Court directed Plaintiffs to file anything further in writing, Tr. 77:16–17. Plaintiffs filed a follow-up memorandum [ECF No. 70] but did not include any monetary calculation regarding defamation.

### C.  Counts against Mr. Jordan

#### 1.  Count II: Conversion

As discussed *supra*, Plaintiffs bring the count of conversion against Mr. Jordan, Mr. Ehigiator, and Supers Wherehouse.  In their motion for default judgment against Mr. Jordan, Plaintiffs state that Mr. Jordan "held himself out to be the agent of [Mr. Hernandez] . . . with the authority . . . to receive money on [Mr. Hernandez's] behalf," along with Mr. Ehigiator and Supers Wherehouse.  Jordan Mot. for Default J. at 2.  Mr. Jordan "directly received the sum of $44,970.00 from the Plaintiffs which was [] intended as part of the payment of [Mr. Hernandez's] fee to perform at the event," and Mr. Ehigiator and Supers Wherehouse each received a sum of $13,500, for a total fee payment of $58,470 from Plaintiffs.  *Id.*  Plaintiffs' theory of conversion is as follows: if Mr. Hernandez indeed was never paid, then Mr. Ehigiator, Supers Wherehouse, and Mr. Jordan "converted the Plaintiffs' property, i.e., the sum of $58,470, to their own personal use, without legal justification or right, to the detriment of the Plaintiffs, $44,970 of which was received directly by Defendant Jordan."  *Id.*

To state a claim for conversion under D.C. law, a plaintiff must allege "'(1) an unlawful exercise, (2) of ownership, dominion, or control, (3) over the personal property of another, (4) in denial or repudiation of that person's rights thereto.'"  *Johnson v. McCool*, 808 F. Supp. 2d 304, 308 (D.D.C.2011) (quoting *Gov't of Rwanda v. Rwanda Working Grp.*, 227 F. Supp. 2d 45, 62 (D.D.C. 2002)).  "Generally speaking, conversion applies to chattel; however, '[m]oney can be the subject of a conversion claim if the plaintiff has the right to a specific identifiable fund of money."  *McNamara v. Picken,* 950 F. Supp. 2d 193, 194 (D.D.C. 2013) (quoting *Cannon v. Wells Fargo Bank, N.A.,* 926 F. Supp. 2d 152, 176 (D.D.C. 2013)).  "A cause of action for conversion, however,

may not be maintained to enforce a mere obligation to pay money." *Curaflex Health Servs., Inc. v. Bruni,* 877 F. Supp. 30, 32 (D.D.C. 1995).

Plaintiffs' filings do not even list the elements of a conversion claim under D.C. law, and it is not immediately apparent to the Court that Plaintiffs' claims would satisfy these elements. But in any event, allowing Plaintiffs to recover this payment under a theory of conversion, in addition to compensatory damages for breach of the same contract, would award Plaintiffs double recovery. The doctrine against double recovery provides that "[d]amages for the same injury may be recovered only once even though they are recoverable under two or more legal theories for two or more wrongs." *CoStar Grp., Inc. v. Leon Cap. Grp., LLC*, No. 21-cv-2227 (CRC), 2022 WL 2046096, at *5 (D.D.C. June 7, 2022) (quoting *Rice v. Dist. of Columbia*, 818 F. Supp. 2d 47, 57 (D.D.C. 2011)); *see*, *e.g.*, *Saunders v. Hudgens*, 184 A.3d 345, 350 (D.C. 2018) (applying this doctrine). If Plaintiffs recover their payment to the management team in addition to expectation damages for the breach, Plaintiffs would be recovering both expectation damages *and* restitution for the amount they paid. Such double recovery is impermissible. In short, Plaintiffs do not clearly make out a claim for conversion—but even if they could, they would be barred from recovering the restitutionary amount of damages they have identified.

### D. Counts against both Mr. Hernandez and Mr. Jordan

The Complaint alleges that Mr. Hernandez and Mr. Jordan are jointly and severally liable with multiple other defendants on Counts III (unjust enrichment), IV (fraud in the first degree), and VI (promissory estoppel). *See* Compl. ¶¶ 90–99, 103–09, ECF No. 1. The Court addresses each in turn.

### 1. Count III: Unjust Enrichment

In the Complaint, Plaintiffs allege that, because "Plaintiffs expended a significant amount of money and a great deal of effort promoting the Event and promoting [Mr. Hernandez's] brand," all defendants "benefited financially from the efforts of the Plaintiffs in promoting Defendant Hernandez's brand" and were therefore unjustly enriched. Compl. ¶¶ 90, 92. But then, in Plaintiffs' Motion for Default Judgment against Mr. Jordan for unjust enrichment, Plaintiffs state that "Defendant Jordan, upon converting Plaintiffs' money in an amount up to $58,470 as referred to in the preceding paragraph, unjustly enriched himself in that amount to the detriment of Plaintiffs." Jordan Mot. Default J. at 3. And finally, in Plaintiffs' Memorandum submitted after the damages hearing, Plaintiffs state that "agents typically receive a cut of at least ten percent (10%) and more often up to twenty percent (20%) of revenues collected"—so, because Plaintiffs tendered $58,470 to Mr. Hernandez's management team, they argue they are entitled to "not less than $5,847 [10%] nor more than $11,694 [20%]" in addition to "a judgment of compensatory damages in the amount of balance of the money deposited by Plaintiffs, not more than $52,623.00 nor less than $46,776.00"—so, all told, a sum of $58,470. Pls.' Mem. in Support of Ex Parte Proof of Damages at 2, ECF No. 70.

Because of the inconsistencies from the Complaint to the Motion to the damages hearing, the Court cannot discern exactly what the Plaintiffs' claim for unjust enrichment is supposed to be. Regardless, this Count is easily disposed of because under D.C. law, Plaintiffs "ultimately cannot recover under both a breach of contract claim and an unjust enrichment claim pertaining to the subject matter of that contract." *McWilliams Ballard, Inc. v. Broadway Mgmt. Co.,* 636 F. Supp. 2d 1, 9 n.10 (D.D.C. 2009). Unjust enrichment is "a remedy designed for the absence of a contract." *Nevius v. Afr. Inland Mission Int'l,* 511 F.Supp.2d 114, 122 n. 6 (D.D.C. 2007). The

Court denies Plaintiffs' motions for default judgment as to both Mr. Hernandez and Mr. Jordan on this count.

### 2. Count IV: Fraud in the First Degree

In the Complaint, Plaintiffs allege "fraud in the first degree," stating that all defendants "knew, or had reason to believe, that [Mr. Hernandez] would ultimately not perform his obligations under the Agreement but did not disclose that fact to the Plaintiffs[,] instead allowing them to continue to expend time and financial resources." *See* Compl. ¶ 96. Under D.C. law, a person commits fraud in the first degree "if that person engages in a scheme or systematic course of conduct with intent to defraud or to obtain property of another by means of a false or fraudulent pretense, representation, or promise and thereby obtains property of another or causes another to lose property." D.C. Code § 22-3221(a). However, this is a criminal offense, and Plaintiffs cannot establish liability or seek damages under this criminal statute.[15] The motions for default judgment against Mr. Hernandez and Mr. Jordan are denied as to this count.

### 3. Count VI: Promissory Estoppel

Plaintiffs' Complaint includes Promissory Estoppel as an alternative theory of liability, stating that "if it is determined . . . that the Agreement . . . was not an enforceable contract, the Plaintiffs are still entitled to recover damages under the doctrine of Promissory Estoppel." Compl. ¶ 103. The Plaintiffs have alleged an enforceable contract here, and factual allegations are

---

[15] Looking at the Plaintiffs' description of this count, it seems like the civil equivalent of what Plaintiffs are seeking is damages for fraudulent misrepresentation. Under D.C. law, the elements of fraudulent misrepresentation are: "(1) a false representation or willful omission in reference to a material fact, (2) made with knowledge of its falsity, and (3) with intent to induce the party to rely on the representation or omission, where (4) the party relies upon the representation or omission (5) to its detriment." *Doe v. Roman Cath. Diocese of Greensberg*, 581 F. Supp. 3d 176, 204 (D.D.C. 2022) (quoting *Cadet v. Draper & Goldberg, PLLC*, No. 05-cv-2105 (JDB), 2007 WL 2893418, at *6 (D.D.C. Sept. 28, 2007)) (internal quotation marks omitted). These elements seem to more closely align with the allegations in the Complaint. However, as explained *supra*, "[t]he first sentence of Rule 54(c) states that a judgment by default is limited to the relief demanded in the complaint." Even if Plaintiffs could have conceivably made out a claim for fraudulent misrepresentation (which the Court has no occasion to address here), the Court cannot take the liberty of amending Plaintiffs' cause of action.

accepted as true now that all defendants have defaulted. The Court has ascertained damages for the breach of that contract. Therefore, recovery under a theory of promissory estoppel is not available, and the Court denies the motions for default judgment as to this count.

In sum, the Court concludes that Plaintiffs have stated a claim for breach of contract against Mr. Hernandez and are entitled to default judgment in the amount of $250,000. And though default has been entered for all defendants, it is "for the court to consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit mere conclusions of law." 10A Wright & Miller, *Federal Practice and Procedure* § 2688, at 63 (4th ed. Nov. 2024 update); *see also Bixler v. Foster*, 596 F.3d 751, 762 (10th Cir. 2010). For Counts 2–6, the Court concludes that the Plaintiffs do not make out a cause of action in their pleadings or motions, or in the alternative, are not entitled to damages. Therefore, the Court will dismiss the Motion for Default Judgment as to Mr. Hernandez and the Motion for Default Judgment as to Mr. Jordan as it relates to those counts, and because the Court believes amendment would be futile, the Court will deny those motions with prejudice. *See In re Interbank Funding Corp. Sec. Litig.*, 629 F.3d 213, 218 (D.C. Cir. 2010).

## IV.    CONCLUSION

For the foregoing reasons, regarding Plaintiffs' Motion [63] for Default Judgment as to Defendant Daniel Hernandez, the Court will **GRANT IN PART** and **DENY IN PART** Plaintiffs' Motion. For Count 1 (breach of contract), the Court will **GRANT** Plaintiffs' Motion and award compensatory damages in the amount of $250,000. The Court will **DENY** the Motion as to all other Counts against Mr. Hernandez with prejudice. The Court will **DENY** Plaintiffs' Motion [73] for Default Judgment as to Defendant Kifano Jordan with prejudice.

A separate Order consistent with this Memorandum Opinion will issue.

Date: March 26, 2025

Hon. Royce C. Lamberth
United States District Judge